IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| MICHAEL D. MCCOWN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. G-06-745 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Michael D. McCown's ("McCown") and

Defendant Michael J. Astrue's, Commissioner of the Social Security Administration

("Commissioner"), cross-motions for summary judgment.  McCown appeals the determination

of an Administrative Law Judge ("the ALJ") that he is not entitled to receive Title II disability

insurance benefits.  *See* 42 U.S.C. §§ 416(i), 423.  Having reviewed the pending motions, the

submissions of the parties, the pleadings, the administrative record, and the applicable law, it is

ordered that McCown's Motion for Summary Judgment (Docket Entry No. 11) is granted, the

Commissioner's Motion for Summary Judgment (Docket Entry No. 12) is denied, the

Commissioner's decision denying benefits is reversed, and the case is remanded, pursuant to

sentence four, to the Social Security Administration ("SSA") for further proceedings.

**I.    *Background***

On December 3, 2003, McCown filed an application to receive disability insurance benefits

with the SSA, claiming that he has been disabled and unable to work since October 27, 2003.

(R. 57-59).   McCown alleges a disability due to coronary artery disease,[1] diabetes mellitus,[2]

diabetic neuropathy,[3] degenerative disc disease,[4] and arthritis[5] in his neck, hands, and back.   (R.

61).

       After being denied benefits initially and on reconsideration (R. 26-27), McCown requested

an administrative hearing before an ALJ to review the decision.   (R. 39).   A hearing was held on

October 4, 2005, at which time an ALJ heard testimony from McCown, and Thomas King

(" King"), a vocational expert (" VE").   (R. 18, 369-416).   In a decision dated December 21,

2005, the ALJ denied McCown' s application for benefits.   (R. 15-25).   On February 6, 2006,

McCown appealed the ALJ' s decision to the Appeals Council of the SSA' s Office of Hearings

and Appeals.   (R. 11-14).   On September 29, 2006, after reviewing additional evidence, the

Appeals Council declined to review the ALJ' s determination.   (R. 5-8). This rendered the ALJ' s

opinion the final decision of the Commissioner.   *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

Subsequently, on November 28, 2006, McCown filed this case, seeking judicial review of the

---

[1]  "Coronary" is a term that usually denotes the arteries that supply the heart muscle.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 405 (29th ed. 2000).  Therefore, "coronary artery disease" is a disease of the arteries that supply the heart muscle.

[2]  "Diabetes mellitus" is a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin or to target tissue insulin resistance.  Type 2 is usually onset between 50 and 60 years of age.  There is no need for insulin injections, and dietary control is usually effective. Obesity and genetic factors may also be present.  *See* DORLAND'S, *supra*, at 489-490.

[3]  " Diabetic neuropathy" is any of several types of peripheral neuropathy occurring with diabetes mellitus; there are sensory, motor, autonomic, and mixed varieties.  The most common kind is a chronic symmetrical sensory polyneuropathy affecting first the nerves of the lower limbs and often affecting autonomic nerves. *See* DORLAND'S, *supra*, at 1212.

[4]  " Degenerative disc disease" refers to a degeneration or deterioration of the disc.  *See* DORLAND' S, *supra*, at 465.  Disc is a general term in anatomical nomenclature to designate the circular flat plates which extend from the axis to the sacrum.  *See id.* at 510-511.

[5]  " Arthritis" is the inflammation of joints.  *See* DORLAND'S, *supra*, at 151.

Commissioner's denial of his claims for benefits. *See* Docket Entry No. 1. In November 2007, the parties consented to trial before the undersigned Magistrate Judge. *See* Docket Entry No. 19.

II.    *Analysis*

    A.    *Statutory Bases for Benefits*

Social security disability insurance benefits are authorized by Title II of the Act and are funded by social security taxes. *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F. 2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997). For purposes of Title II disability benefits, McCown was insured through the date of the ALJ's decision—December 21, 2005. (R. 18-25). Consequently, to be eligible for disability benefits, McCown must prove that he was disabled for some period prior to that date.

Applicants seeking benefits under Title II must prove "disability" within the meaning of the Act, which defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a)

**B.**     *Standard of Review*

1.     *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact.  The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

4

### 2. *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 91971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Masterson*, 309 F.3d at 272.

### C. *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is, in fact, disabled:

1. An individual who is working and engaging in "substantial gainful activity" will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 404.1520(b).

5

2.      An individual who does not have a " severe impairment" will not be found to be disabled.  *See* 20 C.F.R. § 404.1520(c).

3.      An individual who " meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. § 404.1520(d).

4.      If an individual is capable of performing the work he has done in the past, a finding of " not disabled" must be made.  *See* 20 C.F.R. § 404.1520(f).

5.      If an individual' s impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd v. Apfel*, 239 F.3d 698, 704-05 (5th Cir. 2001).  The claimant has the burden to prove disability under the first four steps.  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001).  If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his existing impairments, the burden shifts back to the claimant to prove that he cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id*.

The mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990);

*Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if he demonstrates an " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). " Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable " physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3). " [A]n individual is ' under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .' " *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if he applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social

Security Act and is insured for benefits at least through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's heart disease, degenerative disc disease, obesity, and diabetes mellitus are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix I, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant [has] retains the residual functional capacity to lift and/or carry 10 pounds frequently and 20 pounds occasionally, and walk for 6 out of 8 hours. The claimant, however, must be afforded a sit/stand option. The claimant's ability to push/pull is unlimited, and his gross and fine dexterity are appropriate. The claimant has minimal limitation on climbing stairs. The claimant has no mental impairment.

7. The claimant retains the residual functional capacity to perform his past relevant work as a computer system analyst (20 CFR § 404.1565).

(R. 24-25).  Because the ALJ found that McCown could perform his past relevant work, in a conclusive finding that no disability exists, the ALJ's analysis was terminated and he did not continue on the fifth step of the inquiry.  The ALJ simply concluded with his last finding:

8. The claimant was not under a "disability" as defined in the Social Security Act, at any time relevant to this decision. (20 CFR § 404.1520(f)).

(R. 25).

This court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied.  *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).

To determine whether the decision to deny McCown's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors:  (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

      D.     **_Issues Presented_**

McCown contends that the ALJ erred in finding that he was not entitled to disability insurance benefits.  Specifically, McCown claims that the ALJ erred in finding that his impairments were not of listing level severity.  He argues that the ALJ failed to properly consider all limitations supported by the record.  McCown also maintains that the ALJ improperly found McCown's testimony not credible.  McCown further asserts that the ALJ failed to give proper weight to the opinion of his long-time treating physician.  Finally, McCown argues that the Commissioner erred in finding that he can perform his past relevant work as a computer system analyst.  *See* Docket Entry Nos. 11, 16

The Commissioner disagrees with McCown's contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 13.

E.     *Review of the ALJ's Decision*

1.     *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, he is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *see Zebley*, 493 U.S. at 536 n.16; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulation similarly provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393. The ALJ must address the degree of impairment caused by the combination of physical and mental medical problems. *See Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986) (citations omitted). The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531.

10

The claimant has the burden to prove at step three that his impairment or combination of impairments matches or is equivalent to a listed impairment. *See id.* at 530-31; *Selders*, 914 F.2d at 619. The listings are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. *See Zebley*, 493 U.S. at 529-30. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. *See id.* at 530. For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria. *See id.* (emphasis in original). An impairment that manifests only some of those criteria, no matter how severely, does not qualify. *See id.*

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *Id.* at 531 (emphasis in original) (citing 20 C.F.R. § 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. § 416.926(a). The applicable regulation further provides:

 (1)(i)  If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

   (A)  You do not exhibit one or more of the medical findings specified in the particular listing, or

   (B)  You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

  (ii)    We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

*Id.*  Nonetheless, " [a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531.  Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Knepp v. Apfel*, 204 F.3d 78, 85 (3d Cir. 2000).

A review of the medical records submitted in connection with McCown's administrative hearing reveals that McCown's active problems are type II diabetes mellitus, hypertension,[6] arrhythmia,[7] coronary artery disease, bilateral carotid disease,[8] and his pacemaker.[9]  (R. 114, 150).

On December 5, 2001, a Radiology Diagnostic Report determined that McCown had a normal heart size, calcified granuloma,[10] tortuous aorta,[11] and degenerative changes.  (R. 324). The degenerative changes were seen especially in C 5 - 6 and to a lesser extent in C 4 - 5 with disc

---

[6]  "Hypertension" is high arterial blood pressure.  It may have no known cause or be associated with other primary diseases.  *See* DORLAND'S, *supra*, at 858.

[7]  "Arrhythmia" is used to describe any variation from the normal rhythm of the heartbeat.  It may be the abnormality of either the rate, regularity, or site of impulse origin or the sequence of activation.  The term encompasses abnormal regular and irregular rhythms as well as loss of rhythm.  *See* DORLAND'S, *supra*, at 130.

[8]  "Carotid" pertains to the principal artery of the neck, and "bilateral" pertains to both sides. Therefore, bilateral carotid disease is a disease of both sides of the principal artery in one's neck.  *See* DORLAND'S, *supra*, at 209, 290.

[9]  An artificial cardiac pacemaker is a device that uses electrical impulses to reproduce or regulate the rhythms of the heart.  It may be temporary or permanent, and is connected to the heart by leads and electrodes.  *See* DORLAND'S, *supra*, at 1301.

[10]  "Granuloma" formation represents a chronic inflammatory response initiated by various infections and noninfectious agents.  *See* DORLAND'S, *supra*, at 768.

[11]  "Tortuous" means twisted.  Therefore, a tortuous aorta is a twisted aorta.  *See* DORLAND'S, *supra*, at 1853.

space narrowing and osteophyte[12] formation.  (R. 324).  On the same day, a compensation and pension examination was performed for rating purposes, requested by the VA Regional Office. (R. 344).  The report stated that McCown had, at the time, had diabetes for nine years, and was currently checking his serum glucose level around six times a day.  (R. 345).  McCown also was found to have hypertension for the last fifteen years.  (R. 345).  McCown stated that he had undergone a cardiac catheterization[13] in 1997 after experiencing chest pains.  (R. 345).

On February 2, 2002, McCown had his initial primary care evaluation with Swaroop Avn Reddy, M.D. (" Dr. Reddy"), at the Houston VA Medical Center.  (R. 244).  The record notes that McCown arrived with multiple medical problems, and that he wanted help with his multiple prescriptions.  (R. 244).  At this appointment it was noted that McCown' s height was 70' '  and that he weighed 211 pounds.  (R. 244).

McCown had a follow-up appointment with Dr. Reddy on April 29, 2002.  (R. 246-247). Dr. Reddy noted that the claimant had a carotid endarterectomy[14] the previous week for a blockage in his right carotid.  (R. 247).  After McCown asked for a substitution for his Accupril, Dr. Reddy prescribed Lisinopril.[15]  (R. 247).

---

[12] " Osteophyte" is an abnormal bony growth or osseous - bony tissue - outgrowth.  *See* DORLAND'S, *supra*, at 1290.

[13] A "cardiac catheterization" is a procedure where a small catheter is passed into the heart, permitting the securing of blood samples, determination of intracardiac pressure, detection of cardiac anomalies, planning of operative approaches, and determination, implementation or evaluation of appropriate therapy.  *See* DORLAND'S, *supra*, at 300.

[14] A " carotid endarterectomy" is the excision of the thickened, atheromatous tunica intima of the carotid artery; done for the prevention of stroke.  *See* DORLAND'S, *supra*, at 591.

[15] Lisinpril is used in the treatment of hypertension.  *See* DORLAND'S, *supra*, at 1019.

Another compensation and pension examination was performed on June 18, 2002.  (R. 326-329).   During the examination, McCown reported sporadic numbness, tingling, and burning paresthesias[16] involving his lower extremities that allegedly had been occurring over the past eight years.  (R. 326).   He also stated that he had an increased cold sensitivity in both of his feet, and intermittent leg cramps in both of his calves.   (R. 326).   McCown explained that the above symptoms were aggravated by standing, but that walking actually improved the symptoms.  (R. 326).   McCown also alleged that he had been experiencing numbness in his fingertips for the past two years, which had resulted in limitations performing fine motor tasks, such as buttoning/unbuttoning shirts, and picking up small objects.   (R. 327).   It was determined that McCown was suffering from moderate to severe peripheral neuropathy, predominantly sensory, involving his bilateral upper extremities.  (R. 328).

On August 27, 2002, McCown met with Dr. Reddy for another follow-up appointment, during which no significant changes were noted.  (R. 247-249).   On October 10, 2002, McCown visited Dr. Reddy complaining of muscle aches and pains.   (R. 249).   Dr. Reddy suggested that McCown stop taking Zocor (a medication) in order to determine whether the prescription was the cause of the aches and pains.   (R. 249-250).

McCown had another follow-up appointment with Dr. Reddy on November 15, 2002.  (R. 239-240).   It was reported that McCown has ventricular bigeminy,[17] which was documented the previous day during an episode which lasted from 10:00 a.m. to 6:00 p.m.   (R. 239).   During

---

[16]  " Paresthesia" is an abnormal touch sensation, such as burning, prickling, or formication.  *See* DORLAND'S, *supra*, at 1324.

[17]  " Ventricular bigeminy" is an arrhythmia consisting of the repeated sequence of one ventricular premature complex followed by one normal beat.  *See* DORLAND'S, *supra*, at 209.

those eight hours, McCown stated that he felt weak, but denied any chest pain or sweating. (R. 239).  During the appointment McCown told Dr. Reddy that he had noticed swelling in both sides of his jawbone in the parotid[18] area.  (R. 240).

McCown arrived at the ER on November 23, 2002 stating that he felt nauseated and that the right side of his neck was swelling and itching.  (R. 240).  McCown decided not to wait for the ER doctor, and was advised that he could return to the clinic in the morning if he wanted. (R. 241).  He did not return in the morning.  (R. 241).

On November 27, 2002, McCown visited the Eye Care Clinic for his annual examination. (R. 241-242).  He complained of floaters and a small blind spot in his central vision that was intermittent once or twice a week.  (R. 241).  An opthamology resident, Matthew Dahlgren, M.D. ("Dr. Dahlgren"), determined that McCown's intermittent blurriness might be due to his arrhythmia or his infrequent headache.  (R. 242).  One month later, on December 27, 2002, McCown visited with Erik Weitzel, M.D. ("Dr. Weitzel") complaining of bilateral parotid swelling.  (R. 235).

On January 8, 2003, a radiology diagnostic report determined that McCown's parotid glands were minimally prominent, and that no mass lesions or focal abnormalities could be seen. (R. 221).  Later that day, McCown had a follow-up visit with Dr. Reddy, during which she noted that McCown stated he was upset because he thought he might have a heart attack soon.  (R. 237). At this appointment it was noted that McCown was 70'' and weighed 208 pounds.  (R. 237).

---

[18]  "Parotid" means situated or occurring near the ear.  *See* DORLAND'S, *supra*, at 1325.

On January 28, 2003, the results of McCown's radiology diagnostic report were discussed with him.  (R. 222-223).  He was told that there was no definite causation, and that his swelling symptoms were most likely sialadenosis[19] from his diabetes.  (R. 223).

On March 3, 2003, a cardiac catheterization was performed, and mild coronary disease was found to exist.  (R. 216).  On March 18, 2003, it was determined that McCown should have a pacemaker implanted.  (R. 220).  On March 23, 2003, the pacemaker was successfully implanted. (R. 161, 189-190).  McCown had his first pacemaker follow-up appointment on April 8, 2003, where it was determined that everything looked fine.  (R. 164-165).

On April 22, 2003, McCown had a compensation and pension examination due to his complaints of intermittent blurriness that lasted 30-60 minutes at a time.  (R. 165-167).  It was found that the claimant likely had the etiology for amaurosis.[20]  (R. 167).  Later that day, at an opthamology appointment with Nicholas P. Bell, M.D. ("Dr. Bell"), it was recorded that McCown had vision impairments that may result from his cardiac condition.  (R. 167).

Another compensation and pension examination was performed on April 25, 2003, due to a request for an increase of disability.  (320-323).  At this time the claimant had been diagnosed with diabetes for the past eleven years, and was checking his serum glucose levels around twenty times a week.  (R. 321).  At his previous compensation and pension examination peripheral neuropathy had been confirmed.  (R. 321).  McCown reported that he experiences occasional chest pain, exertional shortness of breath, severe fatigue, and numbness and pain in both feet.  (R. 322).

---

[19]  "Sialadenosis" is a disease of a salivary gland. *See* DORLAND'S, *supra*, at 1635.

[20]  "Amaurosis" is blindness, especially that occurring without apparent lesion of the eye.  "Diabetic amaurosis" is the loss of vision due to diabetes mellitus, such as diabetic retinopathy or diabetic cataracts. *See* DORLAND'S, *supra*, at 56.

It was determined that McCown suffers from diabetes mellitus, hypertension, bilateral carotid disease, retinopathy, and peripheral neuropathy, which were all likely interrelated.  (R. 322).

On April 25, 2003, a radiology diagnostic report showed that McCown had no acute heart disease.  (R. 158).  He attended another primary care follow up appointment on May 30, 2003, where he saw Timothy D. Daniel, M.D. (" Dr. Daniel") instead of Dr. Reddy.[21]  (R. 168-170). The claimant complained of increased lethargy after work, the occasional sensation of an ice pick jabbing into his chest, and tingling/numbness in his feet and toes.  (R. 169).  After the appointment, McCown went to see a social worker at the VA Medical Center in order to discuss possible SSA benefits and other fiscal options since he felt that he was gradually being forced from the employment sector due to his mounting medical difficulties.  (R. 170).

On September 5, 2003, McCown met with Dr. Daniel, and stated that on that particular day, he was feeling fine.  (R. 171).  No significant notes were made in the medical record. (R. 171-174).  Two months later, on November 13, 2003, McCown met with Dr. Daniel again, and again stated that he felt okay, but claimed that he was losing energy fast.  (R. 178-182).  On the same day, McCown visited the VA Social Work Center in order to receive assistance with the completion of Long Term Disability forms.  (R. 178).  McCown had just stopped working  at the end of the previous month (October) due to his lack of stamina.  (R. 178).  Dr. Daniel received McCown' s request for long term disability, and though he agreed with McCown' s limitations, Dr. Daniel put an " indefinite" on whether McCown could return to work until after another echocardiogram was performed.  (R. 178).         On November 25, 2003, McCown had a pacemaker follow-up appointment, where it was noted that all functions were appropriate and no

---

[21]  It appears at this point in the medical records that Dr. Daniel replaced Dr. Reddy as the claimant' s primary care physician.

changes needed to be made.  (R. 182-183).  Several days later, on December 4, 2003, McCown had an eye exam, which showed that he did not have diabetic retinopathy.  (R. 184).

In December, 2003 the medical records indicate that McCown's ejection fraction rate was between 50-55%.  (R. 135).  Since his ejection fraction rate had been 20-25% before he received the pacemaker, his ejection fraction rates were improved.  (R. 135).  However, Dr. Daniel noted on the physician form he filled out when McCown filed for benefits that McCown's ejection fraction rate was still 20-25%.  (R. 336).

On February 2, 2004, McCown was examined by Debra R. Zimmerman, M.D. ("Dr. Zimmerman") at the Diagnostic Clinic of Houston at the request of the Texas Rehabilitation Center.  (R. 113-116).  The report stated that McCown was 100% disabled through the VA because of his frequent bigeminy and the placement of a pacemaker.  (R. 114).  It was further noted that McCown had NYHA class III dyspnea, per his VA doctors, which is shortness of breath with ordinary everyday activity.  (R. 114).  McCown claimed that he gets occasional sharp, sticking or pinching chest pain, unrelated to exertion.  (R. 114).  Dr. Zimmerman concluded that McCown had a minutely limited ability to move about, and that he appeared healthy.  (R. 113).

On the same day, an echocardiogram was performed on McCown, and it was noted that he had an abnormal aortic valve, and that his diastolic function[22] was impaired.  (R. 117).

On June 29, 2004, McCown attended another pacemaker follow-up appointment, where everything was found to be normal.  (R. 156).

McCown received another compensation and pension examination on July 20, 2004. (R. 148-150, 346-347).  It was noted that, at the present time, McCown had dealt with diabetes

---

[22]  "Diastole" is the dilation, or period of dilation, of the heart. It coincides with the interval between the second and the first heart sound.  *See* DORLAND'S, *supra*, at 494.

for the past twelve years; he had been diagnosed with peripheral neuropathy two years prior, he had hypertension for the past eleven years; he had coronary artery disease and bilateral carotid disease; and, that all of these conditions were interrelated.  (R. 149).  McCown repeatedly told the examiner, "I don't have any stamina anymore."  (R. 149).  He also explained that he can only walk on flat surfaces, that he has to stop and rest after walking one flight of stairs, and that "it takes a long time to overcome the shortness of breath and fatigue."  (R. 149).  The examiner noted that McCown's medical examination was not significantly different from the one performed in April, 2003, but opined that McCown's conditions should be expected to progress.  (R. 150).  On the same day, a radiology diagnostic report showed that McCown had no acute heart disease. (R. 152).

On August 19, 2004, the Department of Veteran Affairs reached a rating decision on McCown's current condition.  (R. 357-363).  They found that the rating decisions of August, 2002 and November, 2003 had erred in failing to grant McCown entitlement at the Housebound rate (homebound status).  (R. 358).  They also noted that after evaluation of McCown's coronary artery disease, it was found to be 100% disabling; his pacemaker implant was found to be 10% disabling.  (R. 358).  The decision explained McCown's coronary artery disease disability finding:

> An evaluation of 100 percent is assigned if there is chronic congestive heart failure; or workload of 3 METs or less resulting in dyspnea, fatigue, angina, dizziness, or syncope; or left ventricular dysfunction with an ejection fraction of less than 30 percent… The veteran is followed at the VAMC Houston for his heart condition and has the pacemaker checked every 90 days. The veteran complains of having no stamina, and of low energy, shortness of breath, and fatigue. He has intermittent chest pain related to physical activity. . . The examining physician estimated METs at 3 and stated that veteran's condition is expected to progress.

(R. 359).  The decision also explained McCown's pacemaker implant disability finding:

An evaluation of 10 percent is assigned from March 25, 2003. An evaluation of 10 percent is granted for a superficial scar that is painful on examination. VA examination showed that the veteran has a pacemaker in the left anterior proximal chest wall. The scar was still slightly tender. [T]here was no inflammation or any other abnormality around the scar noted.

(R. 359).   The rating decision concluded that "basic eligibility to Dependents' Education Assistance is granted as the evidence shows the veteran currently has a total service-connected disability, permanent in nature." (R. 360).

Later that month, on August 26, 2004, McCown had an appointment with Dr. Daniel. (R. 133-137).   McCown complained of left upper quadrant pain radiating to his back intermittently. (R. 133). Dr. Daniel prescribed Tylenol #3 for the pain. (R. 136). It was also noted that McCown has total loss of protective sensation in his feet. (R. 136).   At this appointment, McCown's height was recorded as 69'' and he weighed approximately 225 pounds. (R. 133).

At a routine pacemaker follow-up appointment on October 5, 2004, everything appeared to be normal. (R. 131). On the same day a carotid triplex ultrasound examination was performed, which revealed a mild stenosis.[23] (R. 132).

On December 2, 2004, McCown had an appointment with Susan Fish, M.D. ("Dr. Fish") at the Eye Care clinic. (R. 128-129, 285-286).   She determined that McCown had allergic conjunctivitis,[24] but no diabetic retinopathy. (R. 128, 285).

Another pacemaker follow-up appointment on January 18, 2005, showed no significant changes in McCown's condition. (R. 256, 287).   On the same day, McCown visited the VA

---

[23]   "Stenosis" is the abnormal narrowing of a duct or canal.  *See* DORLAND'S, *supra*, at 1698.

[24]   "Allergic conjunctivitis" is simply the medical term for "hay fever."  *See* DORLAND'S, *supra*, at 395.

Social Work Center in order to receive help in completing his application for " Disabled Person"

status.  (R. 257, 288).

On January 27, 2005, McCown visited the Primary Care center without an appointment.

(R. 259-260, 290-291).   He complained of a constant coughing, and had a rash on his leg.

(R. 259, 290).

On February 28, 2005 McCown had an appointment with Dr. Daniel.  (R. 266-270, 297-

301).  He still had the persistent non-productive cough, and complained of elbow pain that had

been continuous ever since a fall he took in October, 2004.  (R. 266, 297).  At this appointment,

McCown' s height was noted as 69' '  and he weighed 222 pounds.  (R. 267).

McCown had another appointment with Dr. Daniel on April 20, 2005.  (R. 280).  There

were no significant changes noted in the medical record.  (R. 280).  Several days later, on April

25, 2005, McCown' s pacemaker follow-up appointment also produced no significant notes in his

medical record.  (R. 279).

The last medical record is dated August 24, 2005, on which day McCown visited with Dr.

Daniel and complained of foot pain which resulted after he twisted his foot while mowing the

lawn.  (R. 317).  His foot was swollen, and still painful at all times.  (R. 317).  A subsequent

radiology report revealed that McCown had a subacute transverse fracture[25] of the base of the 5th

metatarsal.  (R. 316).

" [O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who

is familiar with the claimant' s injuries, treatments, and responses should be accorded considerable

weight in determining disability."  *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621;

---

[25]  A " transverse fracture" occurs when the fracture is at a right angle to the axis of the bone.  *See*
DORLAND'S, *supra*, at 711.

*Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456 (citing *Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211).  It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, based on the objective medical facts and opinions of physicians, the ALJ's decision is not supported by substantial evidence.  The ALJ failed to give proper weight to the opinions of McCown's treating physician, Dr. Daniel, without sufficient rationale and/or explanation.  *See* 20 C.F.R. § 404.1527(d).  As set forth in the administrative record and as summarized above, Dr. Daniel documented his treatment of McCown's disabling conditions.  Dr. Daniel ordered many laboratory and clinical tests in order to correlate his findings as to McCown's persistent pain and heart problems, including: a radiology report which revealed that

McCown had degenerative changes in his heart (R. 324); a cardiac catheterization which showed coronary artery disease (R. 216); and an echocardiogram that revealed an abnormal aortic valve and an impaired diastolic function.  (R. 117)  Additionally, most of Dr. Daniel's findings were discussed and given significant weight in the compensation and pension examinations.  (R. 148-150, 320-323, 326-329, 344-347).

Further, the ALJ inappropriately disregarded Dr. Daniel's findings, and instead, arbitrarily applied significant weight to Dr. Zimmerman's one-time examination.  (R. 21).  Dr. Zimmerman examined the claimant upon request of the Texas Rehabilitation Center, and failed to acknowledge the VA's medical reports, which clearly demonstrate that McCown had several debilitating conditions.  (R. 113-116).

The ALJ also failed to properly evaluate whether McCown's cardiac issues would meet the criteria for Listing 4.02.  Under Listing 4.02, "chronic heart failure" is met when, "while on a regimen of prescribed treatment," there is:

> [d]ocumented cardiac enlargement by appropriate imaging techniques (e.g., a . . . left ventricular diastolic diameter of greater than 5.5 cm on two-dimensional echocardiography), resulting in inability to carry on any physical activity, and with symptoms of . . . anginal syndrome at rest (e.g., recurrent or persistent fatigue, dyspnea, orthopnea, anginal discomfort).

20 C.F.R. Subpt. P, App. 1, Listing 4.02A (2005).  As evidenced by the medical record, McCown issues appear to fall within the Listing requirements.  Almost one year after receiving his pacemaker, an echocardiogram performed on February 2, 2004, revealed that McCown had a left ventricle diastolic diameter of 5.9 cm, thus resulting in an impaired diastolic function as noted above.  (R. 117).  By not mentioning this finding, the ALJ has engaged in the exact behavior that Judge Posner, in the Seventh Circuit, has cautioned against: " . . . judges, including

administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990).

Additionally, McCown's medical records indicate that he experiences symptoms of anginal syndrome at rest. McCown complains of a lack of stamina, chest pain which occurs both during exertion and rest, shortness of breath, and trouble catching his breath in numerous places throughout the record. (R. 70, 114, 115, 149, 178). In sum, McCown's medical evidence shows the following criteria identified in Listing 4.02A: his left ventricular diastolic diameter is 5.9 cm, which is greater than 5.5 cm, and he suffers from symptoms of anginal syndrome at rest. Because the ALJ failed to properly evaluate this evidence, this case must be remanded.

Moreover, in his decision, the ALJ inappropriately picks and chooses comments from the medical record to support the ALJ's unfavorable decision. The ALJ reported in his opinion that McCown would visit Dr. Daniel and other physicians stating that he was "feeling fine," and had no complaints of chest pain or shortness of breath. (R. 21). The ALJ, however, neglected to report the numerous times that McCown did complain of chest pain, shortness of breath, severe fatigue, feelings of weakness, muscle aches and pains, numbness in fingertips and lower extremities, and leg cramps. (R. 114, 149, 169, 237, 239, 247-249, 322, 326-327). Taking bits and pieces of evidence out of context to support a finding of "not disabled" is improper. *See Loza*, 219 F.3d at 393. Because it appears that the ALJ failed to properly evaluate the evidence, the Commissioner's decision is not supported by substantial evidence and must be remanded for further consideration of the evidence.

24

2.    *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir. 1995) (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *See id.*

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that " the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 & n.18. Moreover, " [t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).

Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be " constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. The decision arising from the ALJ' s discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706. However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

Here, the medical records and McCown' s testimony at the administrative hearing set forth his complaints of pain. The ALJ found that McCown' s subjective symptoms to be unsupported by the medical record as a whole, and therefore, not credible. (R. 22, 24). On the contrary, the record is replete with treatment notes from a variety of physicians detailing McCown' s complaints of pain. As noted above, McCown complained of chest pain, shortness of breath, severe fatigue, feelings of weakness, muscle aches and pains, numbness in fingertips and lower extremities, and leg cramps all throughout the record. (R. 114, 149, 169, 237, 239, 247-249, 322, 326-327). Furthermore, the ALJ incorrectly found that there was no evidence of treatment for back and/or neck pain in the record. (R. 22). In fact, Dr. Daniel specifically prescribed Tylenol #3 for McCown' s pain. (R. 136). In view of the ample records documenting McCown' s pain, the ALJ' s opinion discounting McCown' s pain is not supported by substantial evidence.

3.    *Residual Functional Capacity*

Under the Act, a person is considered disabled:

. . . only if his physical or mental impairment or impairments are of such severity
that he is not only unable to do his previous work but cannot, considering his age,
education, and work experience, engage in any other kind of substantial gainful
work which exists in the national economy, regardless of whether such work exists
in the immediate area in which he lives, or whether a specific job vacancy exists
for him, or whether he would be hired if he applied for work. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner bears the burden of proving that

a claimant's functional capacity, age, education, and work experience allow him to perform work

in the national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also*

*Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38

F.3d at 236.   If the Commissioner fulfills this burden by pointing out potential alternative

employment, the claimant, in order to prevail, must prove that he cannot perform the alternate

work suggested.  *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594;

*Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the regulations require the

ALJ " to evaluate the claimant's 'residual functional capacity.' "  *See Carter v. Heckler*, 712

F.2d 137, 140 (5th Cir. 1983); *see also* 20 C.F.R. § 416.961.  This term of art merely designates

the ability to work despite physical or mental impairments.  *See Carter*, 712 F.2d at 140; *see also*

20 C.F.R. § 416.945.  RFC combines a medical assessment with the descriptions by physicians,

the claimant or others of any limitations on the claimant's ability to work.  *See id.*  When a

claimant's RFC is not sufficient to permit him to continue his former work, then his age,

education, and work experience must be considered in evaluating whether he is capable of

performing any other work.  *See id.* (citing 20 C.F.R. § 404.1561).  The testimony of a vocational

expert is valuable in this regard, as "[he] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating RFC, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id*. In *Myers*, the Fifth Circuit relied on SSRs addressing RFC and exertional capacity. *See id*. In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996). The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . . The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited

to less than the full range of sedentary work are disabled will depend primarily on
the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996).  The court also noted that
SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and
requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id.*
To determine that an claimant can do a given type of work, the ALJ must find that the claimant
can meet the job's exertional requirements on a sustained basis.  *See Carter*, 712 F.2d at 142
(citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In the case at bar, McCown contends that the ALJ failed to properly consider all of his
limitations that were supported by the record, and therefore failed to include the limitations in the
claimant's RFC assessment.  *See* Docket Entry No. 11, at pg. 2, 7-10.  McCown argues that the
resulting RFC finding is not supported by substantial evidence because the ALJ should have
included McCown's hand and finger numbness, vision impairment, inability to concentrate, need
to elevate his legs, and limitations resulting from his neck impairment.  *See id.* at pg. 11, 19.

The VE classified McCown's past relevant work as a computer systems analyst as being
"sedentary exertional work level" and "skilled."  (R. 411).  The ALJ posed the following
question to the VE:

> ALJ:  . . . [A]ssume an individual of advanced age with a college education, has
> the ability to lift occasionally 20 pounds, 10 pounds frequently. The option
> of a sit/stand option, ability to walk six of eight hours, the gross and fine
> dexterity is appropriate, the push and pull ability is unlimited, and there is
> no mental impairment. There is some minimal limitation on climbing stairs.
> Based on those elements in that hypothetical, are you able to make a
> determination as to the ability to perform that past work?
>
> VE:  Yes, under that hypothetical, I would say a person could perform his past
> work.

(R. 411).   When McCown's attorney posed the same hypothetical, but with McCown's

testimony as full and credible, the VE had a different opinion:

> Q:     Mr. King, in addition to the hypothetical the Judge has given you, if a
> person requires rest periods and unscheduled breaks outside of the normal
> 15 minutes in the morning and 15 minutes in the afternoon, would that
> change your testimony regarding his ability to perform his past relevant
> work?
>
> A:     Yes.
>
> Q:     And how so?
>
> A:     Under that hypothetical, he cannot perform past work.
>
> Q:     All right. And in addition to that, would he be able to perform any work in
> the national economy?
>
> A:     No, not under that hypothetical.

(R. 411-412).

Only where the testimony by the VE is based on a correct account of a claimant's

qualifications and restrictions, may an ALJ properly rely on the VE's testimony and conclusion.

*See Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).   Unless there is evidence in the record

to adequately support the assumptions made by a VE, the opinion expressed by the VE is

meaningless.   *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).   Here, the ALJ failed

to formulate a hypothetical question to the VE that incorporated the full spectrum of McCown's

physical limitations.   The ALJ summarized McCown's daily activities as much more exertional

than they are in reality.   As a "Deputy Grand Knight," McCown is only responsible to attend

meetings once a month, he only spends about one hour on the computer at a time, and does *not*

really vacuum since a "dust catcher" is mostly used.   (R. 395, 495, 496).

This testimony is hardly consistent with the ALJ's opinion which states that, "as the Deputy Grand Knight of the Knights of Columbus . . . he actively participates in meetings and organizes other association events," "He accesses and operates the computer up to four hours per day," and "performs household chores including vacuuming." (R. 23). Specifically, because the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden to show that despite McCown's impairments, he could perform his past relevant work. As such, the case must be remanded.

Moreover, the ALJ failed to properly consider all of McCown's limitations that were supported by the record. By referring to McCown's peripheral neuropathy very briefly, the ALJ indicated that he did not recognize many of McCown's symptoms associated with the disability. (R. 19). In fact, the ALJ's decision does not adequately indicate whether the ALJ was even aware that McCown's neuropathy affected his hands, legs and feet. (R. 19). As discussed below, McCown's medical record is chalked full of evidence that he experiences the loss of sensation in his legs and feet, numbness in his bilateral fingertips, swelling in his feet, and that these symptoms result in McCown's difficulty with simple tasks like buttoning his shirt. (R. 169, 322, 326, 327, 328, 376, 379).

The ALJ also failed to acknowledge McCown's complaints of blurred vision. McCown's medical record shows that Dr. Bell opined that his vision impairments were related to his cardiac conditions. (R. 167). Based on the foregoing evidence, the ALJ failed to properly consider several debilitating symptoms when formulating the RFC finding. As a result, the case must be remanded in order for the ALJ to reconfigure McCown's RFC.

4.    *Failure to Properly Evaluate VA Disability Determination*

Although " [a] VA rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies is different, . . . it is evidence that is entitled to a certain amount of weight and must be considered by the ALJ." *Chambliss,* 269 F.3d at 522 (citing *Loza*, 219 F.3d at 394); *see also Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994); *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. 1981).

Here, at the administrative hearing, the ALJ did not address McCown' s VA disability determination except in passing:

A:    Right. I get income from the VA.

Q:    Okay. What do they compensate you on?

A:    $2,703 a month. That' s they compensate me 100 percent disability at the housebound rate.

Q:    And when did you start receiving that?

A:    I started receiving that for 1 April, 2003. I had the pacemaker put in on 25 March, 2003, and they started it right then. But they jumped to the 1st of the month following it.

(R. 392-393).  In his decision, the ALJ acknowledged that the VA had rated McCown as 100% disabled. (R.23).  The ALJ, however,  merely recited that the VA' s findings are not binding on the SSA and then simply stated that the VA' s finding was inconsistent with the objective medical record. (R. 23).   While not binding on the Commissioner, the VA' s findings regarding McCown' s disability determination are entitled to a certain amount of weight.  *Chambliss*, 269 F.3d at 522.   Despite the fact that McCown had a 100% VA disability rating, there is no indication that this rating was scrutinized by the ALJ.  As such, this case must be remanded for the ALJ to afford the VA disability rating the proper evaluation and/or consideration.  *See*

*Rodriguez*, 640 F.2d at 686 (" [a] VA rating of 100% disability should have been more closely scrutinized by the ALJ").

III.   ***Conclusion***

Accordingly, it is therefore

**ORDERED** that Plaintiff' s Motion for Summary Judgment (Docket Entry No. 11) be **GRANTED**.  It is further

**ORDERED** that the Defendant' s Motion for Summary Judgment (Docket Entry No. 12) be **DENIED**.  It is finally

**ORDERED** that the case is **REVERSED** and **REMANDED**, pursuant to " sentence four" of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to the Commissioner for a new hearing to properly consider, if necessary by a medical doctor, the severity of McCown' s alleged peripheral neuropathy and blurred vision, to give proper weight to the opinions of McCown' s treating and examining physicians, to determine whether McCown' s impairment meets the criteria of Listing 4.02A, to incorporate McCown' s alleged physical functional limitations in a hypothetical question to the VE, to develop clear testimony from a VE regarding jobs, if any, McCown is capable of performing considering all of his limitations, to consider McCown' s physical limitations in his RFC and credibility assessments, and to properly weigh the VA' s disability rating.

**SIGNED** at Houston, Texas, on this the 14th day of March, 2008.

Calvin Botley
United States Magistrate Judge